podium. State your names. As far as argument, no more than 15 minutes, but I reserve a couple minutes for rebuttal. Good morning, Justices. My name is Russell Ainsworth with the Exoneration Project of the University of Chicago Law School. I represent Petitioner Rodel Sanders. I ask you both to keep your voices up. Thank you. How much time will the argument take? I anticipate 15 minutes for argument. Very good. Mr. O'Brien, you may proceed. Good morning, Your Honors. May it please the Court. Again, Assistant State's Attorney Anthony O'Brien for the Court. I would like to begin by acknowledging the Court's failure to disclose Jermaine Hasslett's recantation from May 2004. This Court, therefore, should reverse the judgment of the Circuit Court granting post-conviction relief to the defendant based on ineffective assistance of counsel. The only issue here is whether Hasslett's May recantation presented a reasonable chance of changing the outcome of the case. The Circuit Court offered nothing but legal conclusions on this question. It found that the defendant was prejudiced because he was denied the right to testify about Hasslett's May recantation. The Court, however, never identified in its decision what the defendant actually planned to say about the recantation. And more importantly, it never examined what the consequences of those testimonial topics would have been. What test do we use to determine whether or not the trial court erred, counsel? The standard of review? Your Honors, in this case, there were a bifurcated standard. It's manifestly erroneous for whatever factual findings that the trial court made. And it's a no-go standard for its assessment of proceedings that it had that it did not preside over, that it just relied on the record. And its ultimate legal conclusion about ineffective assistance of counsel. Of course, your opponent disagrees, and he maintains that the standard of review is manifestly erroneous. Tell me why he's wrong. Your Honors, it seems wrong for a couple of reasons. One is that this is a large record. With most of the proceedings, Judge Turner, who gave the ruling in this case, did not preside over. His ability to interpret the record is the same as yours or mine, anybody who reads cold records. So on that, it's a de novo standard. He has no special ---- But it is, in fact, correct that there was an evidentiary hearing, correct? Correct. Okay. And when there was the evidentiary hearing, didn't he, isn't he just required to apply established law to the facts? He is, but, and I think when it comes to whatever facts, findings of facts he made, it's a manifestly erroneous standard. But also, like, when you look at proceedings where you determine if there's ineffective assistance of counsel following an evidentiary hearing, say, after a trial, you would look at whatever findings of fact that the Court makes and give it a manifestly erroneous. But as far as the ultimate legal conclusion is ---- What case do you use to support this theory that it's a bifurcated standard of review? There's a couple of cases. There's Pendleton, which discusses whether the trial court has any special familiarity with the proceedings. And there's the Harris case that discusses the de novo standard with the ultimate conclusion of law and the manifestly erroneous with respect to actual findings of fact. And I think in this case, when you look at the trial court's written decision, there are no finding of facts inside there. As I was saying, Your Honor, is that the Court does at no point identifies what testimony from the evidentiary hearing Well, he did conclude that the description better fit the flipper. Is that correct? Mr. Haffner? Yeah, he had made that observation. Verifying of fact? No. In fact, I think that's very problematic because it's invading the jury's subject. All those facts were elicited at trial. And in fact, that was a major part I guess my question to you is, in the judge's written memorandum, did he arrive at a finding of fact as it relates to the identification testimony of Ms. Armstrong vis-à-vis Mr. Haffner? No, I don't believe he did. And I would say this, to whatever extent he did, it was All we had was her testimony from the trial. And the fact that she had, she was off in terms of his height and whether he was slim or not, that was all evidence that was given to the jury. And that was litigated before. And in fact, to what extent the Court is making any findings on that, it's relitigating what happened at trial based on no new evidence. What was the purpose of the evidentiary hearing? What was he supposed to do with the evidence that was elicited during that hearing? The Court was supposed to hear what the defendant would have, well, what he would have done had he been able to, yeah, well, what would the trial have looked like if the May recantation had been available, had it been disclosed and been usable at trial? And the defendant testified that, I mean, the crux of his testimony is that I wanted to use the May recantation in order to rebut Hasslet's testimony that he coerced the July recantation from him, which is the letter to Wendy Jones. And Hasslet had testified that it was obtained by the defendant and Patrick Taylor, who was a fellow gang member, that they had held a prison shank to his throat and they had him copy a letter word from word. So he wanted to use the May recantation in order to say, well, I didn't have a motive to obtain a recantation in July if I already had one in May. But there's problems with that theory. And also that I didn't have a court date in July. Oh, yeah, he says that he didn't have, because I think, well, Hasslet does say that it happened on July 29th. And that's the date that's on the letter. You know, they had a court date on July 28th together. So, I mean, he was off by a day. And so, I mean, this is kind of an easy discrepancy to resolve. I mean, you have a witness who's off by a single day that they were in court. And you can imagine that Hasslet's recollection is drawn from the letter, which is dated July 29th, which was copied verbatim by what the defendant gave to him. So that's nothing ground-shaking that he was off by a day, the day of the event. So he also mentioned that he wanted to give alibi testimony, that he needed the recantation to get it. There is no connection between the recantation and the alibi. I mean, the recantation from May doesn't, none of the facts of that relate to the alibi. He could have taken the stand. Mr. O'Brien, wasn't he essentially saying that I wanted to testify, not just as to the May-July discrepancy, but he was really saying I wanted to testify. But once the recantation was barred, I realized that it would just be my word against the state's witnesses. So it wasn't just for the limited purposes of rehabilitating the recantation. He wanted to testify. Well, I agree with you. And, I mean, that is the sum total of it. Resuscitating the July one seemed to have been prominent in his testimony. But you're right. He says he wanted to testify. But, I mean, the important thing is he can't use the May recantation as his excuse for not testifying. You are not denied the right to testify just because in your assessment of, you know, the costs and benefits of taking the stand may not weigh in your favor. I mean, that's not denying you the right to testify. He could have done it. And he could have testified about his alibi without the May recantation. It wasn't a part of it. He could have testified about the discrepancy between the days. He says he also wanted to testify that it wouldn't have been an anomaly for him or for Haslick to write a letter to Wendy Jones. He didn't need the May recantation in order to do that. So there's plenty that he could have taken the stand to testify without having the benefit of the May recantation. And that seems to be now a crutch for his reason why he didn't do it or why he didn't take the stand. But it doesn't buy him an excuse for this. He had testimonial grounds to do it. And just saying that, well, you know, I was afraid of being crossed on certain subjects, I mean, that doesn't cut it. You're always at risk of being crossed on, you know, adverse subjects when you take the stand. Your Honors, both the defendant and the circuit court characterize that May recantation as the defendant's primary defense. I mean, the circuit court does it but never explains how he planned to use it. And I think this is a significant overstatement because ultimately the May recantation, it simply impeaches Haslick with a prior inconsistent statement. And on that score, it offers little or no value. Haslick had already been impeached on three other grounds at trial. He had been impeached by the July letter, which was a recantation. His lawyer impeached him with a prior felony conviction. And his credibility was impeached by the fact that he was admittedly an accomplice in this offense and that he had negotiated a favorable plea bargain in exchange for his testimony at trial. So, you know, effective assistance of counsel, in order to receive it, you do not have an entitlement to have a witness impeached on multiple grounds. I mean, when they've already been thoroughly impeached, it doesn't deny you the effective assistance of counsel just because you didn't get the full, robust amount of impeachment that you expected. And this is particularly true in this. Could the May have been used to impeach Armstrong? Pardon? Could the May statement be used to impeach Armstrong? No. I mean, she's not mentioned inside of it. It does nothing to affect her credibility. I know that that's an argument that the defense makes, but I think that's misusing what the recantation is. It's not substantive evidence. It's just impeachment. In our briefing, we cite the Douglas case, which is a new one from this court, that says you do not use impeachment evidence to corroborate or prove facts at trial. You use it just to impeach the target of the impeachment. In this case, it's Haslett. It'd be his statement. It's not anything that Armstrong said. So there's no direct impeachment of her at all. I mean, you can say, well, I suppose you've weakened the credibility of one witness. Maybe you're going to rely more on the other. But it certainly doesn't affect her credibility. She's not responsible for anything that was said in that. Your Honors, in this case, which is important briefly, I know you did in your brief, but briefly summarize the difference between the May statement and the July letter. Sure. The May statement is a collection of questions pre-written by the defendant, all in a leading nature. And in it, he discusses that he lied. He says that he lied to the police and that he was scared. But he also gave evasive and incomplete answers to some of the questions. For example, he didn't identify the people who committed the crime. He didn't identify who removed Atkins from the car. He didn't identify who removed Armstrong from the car, which is particularly important because that's the role that the defendant played in the crime. In the July statement, it's a full-throated recantation inside there. All of these questions are answered. And most importantly, you have the defendant twice saying that, I'm the one who removed Armstrong from the car and escorted her to the garage. So you have a far more robust recantation in July than you do in May. So, I mean, the May recantation itself is incomplete, and it contains evasive responses, which, as we argue, is that this is a motivation for the defendant to obtain a full or incomplete recantation two months later. Particularly, if you see it from the perspective of the jury, that you have a superior gang member who tries to arrange with a subordinate gang member taking the blame for the crime. And then he refuses to do it after he's hired a private investigator. He pays for it himself. He writes the questions. He says he has a face-to-face discussion with Haslett in the prison where they were both housed together. So there's his expectations, and then Haslett balks at it while he's in there. He doesn't answer several of the most important questions at it. In the jury's view of this, you can see, I mean, it's perfectly reasonable for the jury to conclude that you get this escalation from the defendant afterwards, that he doesn't get Haslett's cooperation. That in July, you see him take a far more direct approach where he personally, along with Patrick Taylor, that they corner him in the bullpen at shame point and have him copy verbatim a letter to get the recantation. If Your Honors don't have any other questions, we would ask that this Court reverse the Circuit Court's judgment and remand for further proceedings. Thank you very much, Mr. O'Brien. May it please the Court. Our Constitution does not guarantee a perfect trial, but it demands a fair trial. Mr. Sanders did not get a fair trial in this case. A trial is a search for truth. And the way that we have defined the best way to get to the truth is through the adversarial process. Each side in a dispute represented by their lawyers to come together and find out what the truth is. And when one side is hampered by ineffective assistance of his counsel, a trial becomes a one-sided affair. This is particularly true when the ineffective assistance of counsel concerns the ability to cross-examine one of the main witnesses for the State. The way that we get to truth in our system of justice is through cross-examination. You have live witnesses testify before a trier of fact. You're able to cross-examine that witness with evidence. The jury in Mr. Sanders' case only heard a part of the evidence. And that was because, as this Court has found, Mr. Sanders' counsel was not just ineffective, but ineffective to a constitutional level. Now, the standard review that we have here is that Mr. Sanders does have the burden, but he must only show that there's a reasonable probability of a different result on a retrial. And he's done that here. Because stated another way, any error to be harmless must be harmless beyond a reasonable doubt. Ginsburg. Counsel, let me back up. You said they didn't have the opportunity to cross-examine a witness. Who's the witness? Mr. Hazlitt. Because of the impeach – because of the failure to tender the State cross-examination. Yes. But the amount of cross-examination was diminished. And the impact of the cross-examination was diminished because of the inability to cross-examine Mr. Hazlitt on his prior statement. And let me go to explain exactly why that was so important and the ripple effects that that failure had here. It would have allowed Mr. Sanders to present a neutral witness. This is a third-party investigator to be able to testify that Hazlitt had recanted to him as a neutral party, noninterested person, not Mr. Sanders, not Mr. Sanders' girlfriend, but a neutral party. He's neutral, but the questions he gave him were written by your client, right? They were. And he asked – He didn't ask him anything else. No, he didn't ask anyone else. He didn't know anything about the case. He was only able to gather the information that he could from Mr. Sanders visiting him in prison, asking him the questions of the witness. But let's talk about – Who paid the investigator? Mr. Sanders did. Mr. Lott was unwilling. Okay. Mr. Sanders paid him. Okay. The State talks about the difference between whether this could be used for impeachment or as substantive evidence. And I submit to the Court that it doesn't matter, because either way, Mr. Sanders has an extremely strong case. One, let's say that Mr. Hazlitt on the stand had denied ever making such a statement, and the State is then saying, oh, it can only be used for impeachment purposes in that instance. I cannot imagine a stronger piece of impeachment evidence if there is a third-party neutral witness on the stand saying that this man, Mr. Hazlitt, recanted to me and said these things. And Mr. Hazlitt's response is, oh, I didn't say that. There cannot be more powerful impeachment evidence on that score. But let's take it the other way. Let's say that Mr. Hazlitt says, yes, I did make that statement. Then it can be used as substantive evidence as the State concedes. And under that scenario, what you would have on the record that's before this Court is that Mr. Hazlitt never told any of the Assistant States Attorneys that he had made such a statement to the third party, because the prosecutors – What prejudice did it cause? Isn't that what we're – Exactly. And that's – that's exactly the point I'm making. Because he didn't have a second opportunity to prove that – or not to prove, but to state that he lied to police. Because that's – Which is part of it. Okay, but he proved that by the July letter. But the – he couldn't prove it through the July letter because Mr. Hazlitt got to stand up and say, oh, that was coerced. And we weren't – Mr. Sanders was not able to impeach that coercion testimony by saying, wait a minute, you testified to a neutral third party, or you gave a statement to a neutral third party two months prior. You were recanting your testimony, and you never claimed to the States Attorneys that you were coerced into making that May recantation. And we know that because the prosecutors in this case took the stand and testified back in 2006 and said they knew nothing about any May recantation. So there is no – so the record that we have is that Mr. Hazlitt never brought this up to the prosecutors. And so for him to – on retrial, to say, oh, wait, wait, that was coerced out of me too. Well, why didn't he tell the prosecutors about this during all this trial prep? But let's talk about how they prejudiced Mr. Sanders. Because one of the main things was that Mr. Sanders had no motive or at least, at the very least, a significantly reduced motive to coerce Mr. Hazlitt into recanting in July because he already had the May recantation. Well, did they have – in the May letter it says, did you lie to Mr. Sanders? About Mr. Sanders. About Mr. Sanders. Yes. Okay. It says that here. Doesn't the July letter say the same thing? But the July letter had much reduced evidentiary value because Hazlitt was able to explain it away by saying, oh, I was just coerced by Mr. Sanders into making that statement. And there is no way for the defense to rebut that. The powerful piece of evidence to rebut that – Because the May letter, he would say the same thing from the May statement. No, because it would have – and I grant the Court is correct that it would have – you have two statements saying the same thing, both recantations. But the power and the importance of that May recantation is it would have reduced or obviated the need for Mr. Sanders to have a motive to coerce Mr. Hazlitt in July to make a recantation because he already had obtained a recantation in May. And that's why – and this is an important – Did the May statement say what were their names? No. And this is – this is – The May statement didn't say that? The May statement did not say it. What the May statement said is that he refused to answer that question. I'm reading the May statement. What were their names? It's on the second page. Is that in there or not? I believe so. There's one part where he says that – where Mr. Hazlitt says, Rob, face on. And then he takes the – and then he says – then he takes that back. So he recants within the recant. But he also refuses to answer the – Do you know the answer then? Parentheses. Afraid to give out – give our investigator any names because he thought he might implicate himself. That's the answer with parentheses. Yes. I take it that's the investigator. Mr. Motz's name is? Mr. Motz. Okay. I take it that's his answer. Correct. That's what Mr. Mraz put into that. Put in there. Okay. So he didn't tell the names. He did not give the names. Well, he provided a name, then he recanted it. But there's also – He didn't say it. The answer is here. He first says, Rob, face on. And then he takes it back. Okay. The document will speak for itself. And the next question – I'm sorry, you need to get these. Yes. That's in your – Yes. You did the same thing I did. And the next question, isn't it true that you were really the one that forced Ms. Armstrong out of her car on December 15, 1993, about 2.26 a.m., and forced her to walk down an alley? Answer. Would not answer. Correct. Okay. But does he – in the July letter, what does he say? He says that he is the person who performed that action. But the silence, the refusal to answer, you can infer guilt from refusal to make a statement in response to a question. And that's – The question is prejudice. And that's where the prejudice comes, because Mr. Sanders could have used the May recantation to show that Mr. Haslett was guilty because he refused to answer the question when asked, were you the person who actually ordered the victims to be shot? And moreover, we haven't gotten to the part where, in conjunction with this, Mr. Sanders would have been able to take the stand had this evidence come in freely and been able to testify. And the problem that he had was if he took the stand and testified, he would have wanted to say, the reason I didn't coerce Mr. Haslett into making a recantation in July is because in May, I had already gotten a recantation from him. But he couldn't say that. But he didn't have this information in the May statement, and he gave it in July. Well, he had information that Mr. Haslett had admitted lying against him and had admitted being told by the police to put Mr. Sanders' name into the case. He had that information. And when you're on the stand in front of 12 jurors who are watching you, if there's evidence that you would like to say to explain your actions but are prevented from doing so because of your counsel's ineffective assistance of counsel, then the inference that the jury will draw from your hesitation, from your evasiveness, is that you are lying and that you are guilty. Because you can't say timeout while you're on the stand. Timeout, jury. I want to say that I have no motive to coerce this confession in July because I actually received a recantation in May, and I already had that. I received a recantation, but there's several things he did not receive which are beneficial to him. And those things are in the July letter. We agree with that. Where's the prejudice? The prejudice comes because he could not corroborate the fact that Mr. Sanders had no motive to coerce him or a reduced motive to coerce him in 2000, in July. In addition, as the circuit court found, and when we're applying the manifestly erroneous standard, you have to find that it's not just wrong, but plain evident and indisputably wrong in order to overturn. And the circuit court found that Mr. Sanders' ability or decision to testify was impacted by his counsel's error, and that prevented Mr. Sanders from providing testimony to rebut not just the fact that he had a reduced motive to coerce Mr. Hazlitt, but also that he did not in fact coerce Mr. Hazlitt to recant. He also would have testified to his innocence, and this is all evidence that was borne out at the EdVenture hearing that the circuit court credited. The circuit court credited Mr. Sanders' testimony. It is not a sufficiency of the evidence test. That's not the test that's to be applied here. The test is, is there a reasonable probability that a different result would be obtained upon retrial? And you're saying there is a reasonable probability if the may recantation had been used at the first trial that the result would have been different. That's your position? Absolutely. And in addition, Mr. Sanders had no felony convictions. There was no way that he was going to be impeached with a prior felony conviction. He was going to testify about there being no opportunity to coerce Mr. Hazlitt into recanting in July of 1994. Not only was there no court date on that particular day, but he would have testified to the numerous times that, that any inmate who's being brought to testify at court is strip searched before they go to the bullpen, strip searched after they're in the bullpen, including removing your shoes, shaking out your shoes, and bending them to ensure that no weapons, no contraband are brought to and from court. How about the, unless you want to finish that thought. Go ahead, Judge, or Justice. How about the closely balanced issue? So what we have here is we have two witnesses that the state was able to trumpet at trial. Ten times in closing, the prosecution talked about the ways that the two witnesses, Hazlitt and Armstrong, corroborated each other, talking about how they fit together like pieces in a puzzle. If you take one away, the other one standing alone, it's not a sufficiency evidence test, becomes much, much weaker. This is what Kyles v. Whitley, the United States Supreme Court recognized, that evidence that goes to attack one state witness can result in a retrial, can require a retrial, even if another witness stands unimpeached. And here we have a witness who is 19 years old, who is traumatized at the time, whose initial report was of a, that the offender number three was a tall, thin person. And Kyles v. Whitley also talks about the problems with a statement that evolves over time with how that becomes a problem with its reliability. Before there was any outside influence on Ms. Armstrong, she said that the man was six feet tall, was of thin build. The circuit court got to observe Rodell Sanders, and the circuit court reported that he is not thin. He is stocky. And I will tell you, Justices, the state says, oh, well, Ms. Armstrong said he was wearing a jacket. But as we point out in our brief, a jacket can make a thin man look stocky, but a jacket cannot make a stocky man look thin, and if it could, then 70 percent of Americans would be out wearing those coats. It can't happen. It is not an acceptable explanation for the discrepancy in her testimony. Her testimony, in addition, her testimony, standing alone, might be sufficient to convict, but it is not sufficient under the analysis that this Court must employ to prevent a fair trial from being held. And that's all Mr. Sanders is seeking. He is saying that he is innocent. He is alleging that. All he wants to do is have the opportunity to prove it at a fair proceeding where all of the evidence can come out. Because the Post-Conviction Act talks about the balance between finality and the need for finality in our justice system and the need for a just result. And sometimes issues of finality must give way to the need for justice, and this is one of those cases. In your brief, you say that Armstrong was quickly shuttled. How can you justify quickly shuttled? Well, she was somebody who was sleeping in a car. She was then awoken to men with guns who were strangers. And let's not forget that. There's a big difference between an identification of somebody that you know and a stranger identification of somebody that you've never seen before. She is brought from the car to a dark building where it's so dark where There's things that happen in between. Yes, they're walked along. There's nothing that happens in between the time that she's taken out of the car and then brought into the, there's no like stopping for great periods of time. She is brought directly from and then is brought directly into the garage where Mr. Atkins was shot. What does happen between her being awakened and taken, eventually taken to the garage is she comes in contact within 50 feet of various light sources. Yes, Your Honor. And she does come in contact with various light sources. She also has the best ability to view the offender's heights because she is standing as she testifies face-to-face with them. She testifies that, or she described one of the offenders as being between 5'5 and 5'7 and 16 years old. Can't be Rodel Sanders because he was 29 years old at the time. And the other guy, the guy who was offender number three, was tall and thin. And that fit Jermaine Haslett's profile. But she was never shown a photograph of Jermaine Haslett. He was never put in a lineup to show to her. And the May recantation would have also allowed the Sanders defense team to be able to attack the police investigation with more vigor. Because you've got a situation where Ms. Armstrong was shown Rodel Sanders' photo, even though he's 5'8 and stocky, when she's describing a guy who's 6' tall and slim. And if you have the May recantation, which casts doubt on Mr. Haslett's, I was coerced to make the July recantation story. This has nothing to do with this case. Could a defense attorney have a lineup? The problem is with a defense attorney lineup is that Ms. Armstrong has already made an identification of Mr. Sanders. I'm not talking about this case. In any case, and I'll just say in general, the problem is, and we know this from eyewitness research, that once the eyewitness has made an identification and then gets feedback that this person has been charged with a crime, that witness becomes locked into that story and that their confidence of their identification becomes much, much stronger. And if you show them a picture of a real perpetrator, they're much less likely to be able to pick out that person. And that's why you look at their very first description of the offender, because that is the most reliable indication of what they actually saw before there's any outside influence. Thank you. If there are no further questions, we respect. Just a moment. One second, counsel. Certainly. Do you have something to add? Just that we talked extensively in our brief about the standard review to employ, that it's a manifestly erroneous standard. And we cited Pendleton is actually on our side of the issue. The State points to Pendleton, but Pendleton explicitly says that there's an evidentiary hearing that this Court must review the conclusions under manifestly erroneous standard. And the State argued the other side of this coin in Taylor, and they prevailed. They said that, no, you don't do a bifurcated standard review. You do manifestly erroneous standard. And that was the Taylor decision by our Supreme Court decided in 2010. Now they're trying to say it the other way just because the ruling went against them. Do you want to comment at all on the circuit court's memorandum of opinion and order? I mean, did the circuit court, did they, did the court consider the slim factors? The court went through the testimony as a whole. We have in the record evidence that the court did review every piece of the trial testimony and then heard live testimony from Mr. Sanders. And in conducting that hearing, it applied the findings it made in respect to Mr. Sanders' testimony about his ability to testify and his ability to testify, as well as the impact that the error had on the trial and found that prejudice resulted. The court did not, as I read it, the court did not provide any reasons why the eyewitnesses' testimony was reliable or not reliable. Well, the, the, actually, the circuit court did talk about why it was reliable or not reliable. The circuit court found that the witness' initial description was of a six-foot tall person who is slim. And so implicitly is, is the circuit court is saying that this is not an ironclad identification. This is not the situation where you have somebody who already knows who the perpetrator is, knew them from before, and is now where the identification can't be impeached. So the circuit court explicitly did make that finding. Okay. Thank you. Thank you, Justice, and we urge you to affirm the circuit court. Thank you very much, Counsel. Mr. O'Brien, do you have any rebuttal? Two things, Your Honor. First is Counsel characterizes the May recantation essentially as a game changer just because it was obtained. He says by a neutral third party. I thought he said there was a reasonable probability that the result might have been different. He didn't call it a game changer. No, that's my words, but you're right. Yes, they're saying it's a, it's a reasonable probability. But the focus on the fact that it's by who got it, which is the neutral third party. We, we get that. Yeah. Thanks. He hires them. He pays for them. He writes the questions. Okay. Just to add one other thing. Your Honor has mentioned about whether he was quickly shuttled or Armstrong was quickly shuttled into the garage. I mean, that's, that's not accurate. Our defendant makes several demands for her to get out of the car while they're, while she's in there. When they get out, she has a face-to-face encounter with them right outside of the car. They then walk across the street. They stop. They're under street lights. The defendant asks her her name. They have, I don't know what she says to them. But they stop and they have another face-to-face encounter. They walk down the alley and then they stop again where she's going to be searched. I mean, this is a long walk and they stop along this way. She just wasn't taken out of the car and then brought into the, into the, you know, the pitch black garage where you couldn't see. She had plenty of opportunity to identify him along the way. Unless Your Honor has any other questions, we ask this Court to reverse. Anything? Anything? Okay. Thank you very much. Thank you, Your Honor. Thank you, Mr. O'Brien. I want the attorneys to know that we thought the briefs were excellent. We will take this matter under advisory. The Court stands at recess.